UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| MAYOLO GARCIA; JOAQUIN BLAS GARCIA; JAIME SANCHEZ ANDABLO; RAFAEL RODRIGUEZ AGUILAR; VINCENTE RENDON RODRIGUEZ; BENITO TAPIA MORALES; DANI OLIVARES PALMA; ANGEL GARCIA MUNOZ; and ARTURO SANCHEZ DOMINGUEZ, | Case No. 13-CV-3182 (PJS/LIB) |

Plaintiffs,

v.

ORDER

BRENT SPELDRICH, Minnesota Department of Natural Resources Officer, individually and in his official capacity; GREG VERKUILEN, Minnesota Department of Natural Resources Officer, individually and in his official capacity; JESSE J. TABOLICH, Officer, United States Department of Homeland Security; JOHN DOE #1, Officer, United States Department of Homeland Security; SHERIFF BRENT C. LINDGREN, MILLE LACS COUNTY SHERIFF, individually and in his official capacity; JEFF VEE, Mille Lacs County Deputy, individually and in his official capacity; DAN MOTT, Mille Lacs County Deputy, individually and in his official capacity; and ADDITIONAL JOHN AND JANE DOES, Mille Lacs County Jail Deputies, individually and in their official capacities,

Defendants.

---

Bruce D. Nestor and Abigail Wahl, DE LEON & NESTOR, LLC, for plaintiffs.

Jason M. Hiveley, IVERSON REUVERS, LLC, for defendants Brent C. Lindgren, Jeff Vee, and Dan Mott.

Oliver J. Larson, MINNESOTA ATTORNEY GENERAL'S OFFICE, for defendants Greg Verkuilen and Brent Speldrich.

Sarah B. Fabian, UNITED STATES DEPARTMENT OF JUSTICE; and David W. Fuller, UNITED STATES ATTORNEY'S OFFICE, for defendant Jesse J. Tabolich.

Plaintiffs are nine Hispanic men who were stopped by conservation officers while they were hunting, asked to produce their hunting licenses and to verify their identities, and then detained while they participated in a telephone interview about their immigration status with agents of U.S. Immigration and Customs Enforcement ("ICE"). Following that interview, five of the nine plaintiffs were jailed at the direction of ICE because they were not lawfully present in the United States.

Plaintiffs brought this lawsuit against two conservation officers employed by the Minnesota Department of Natural Resources, two special agents employed by ICE, and the Mille Lacs County Sheriff and two of his deputies, alleging that defendants seized them in violation of the Fourth Amendment and targeted them because of their Hispanic ethnicity. Based on those allegations, plaintiffs bring claims under 42 U.S.C. § 1983; *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971); and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 et seq.

This matter is before the Court on defendants' motions to dismiss the amended complaint. *See* ECF Nos. 19, 31, & 35. For the reasons that follow, the motions to dismiss of

the ICE agents and the Mille Lacs County officials are granted in full, while the motion to

dismiss of the conservation officers is granted in part and denied in part.

## I.   FACTS

The Court assumes — as it must in ruling on a motion brought under Fed. R.

Civ. P. 12(b)(6) — that the factual allegations pleaded in the amended complaint are true.  *See*

*Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008).

Plaintiffs Mayolo Garcia and Joaquin Blas Garcia are citizens of the United States.  *See*

Am. Compl. ¶¶ 1-2 [ECF No. 13].  Plaintiffs Jaime Sanchez Andablo and Arturo Sanchez

Dominguez are lawful permanent residents of the United States.  *Id*. ¶¶ 3-4.  For ease of

reference, the Court will refer to these four plaintiffs as "the Group I plaintiffs."  The remaining

plaintiffs — Angel Garcia Munoz, Rafael Rodriguez Aguilar, Vicente Rendon Rodriguez, Benito

Tapia Morales, and Dani Olivares Palma — are neither citizens nor lawful permanent residents

of the United States.  *Id*. ¶¶ 5-9.  The Court will refer to these five plaintiffs as "the Group II

plaintiffs."

On November 10, 2012, all of the plaintiffs were deer hunting in the Mille Lacs Wildlife

Management Area ("WMA") in Mille Lacs County, Minnesota.  *Id*. ¶ 22.  Defendants Brent

Speldrich and Greg Verkuilen, who were employed as conservation officers by the Minnesota

Department of Natural Resources, approached the plaintiffs while they were gathered in the

parking area of the WMA.  *Id*. ¶¶ 10-11, 24.  Speldrich and Verkuilen asked eight of the nine

plaintiffs to produce hunting licenses.  (The officers apparently did not ask the ninth plaintiff,

Jaime Sanchez Andablo, to produce a hunting license because he was not dressed in blaze

orange.)  *Id*. ¶¶ 23-26.  Each of the eight plaintiffs who were asked to show a hunting license did

so.  *Id.* ¶ 27.  After examining the licenses, Speldrich and Verkuilen told the plaintiffs that the licenses appeared to be valid.  *Id.* ¶ 28.

Speldrich and Verkuilen then asked that the eight plaintiffs with hunting licenses produce a driver's license or other form of identification.  *Id.* ¶ 29.  The eight plaintiffs did so.  *Id.* ¶ 33.  One of the plaintiffs, Angel Garcia Munoz, produced a Mexican identification document.  *Id.* ¶ 36.  That Mexican identification document listed a Minneapolis address for Munoz, even though Munoz was hunting with a *non*-resident license.  *Id.* ¶ 37.

This discrepancy caused Speldrich to call ICE.[1]  Speldrich first spoke with defendant Jesse J. Tabolich, a special agent with ICE.  *Id.* ¶ 12, 41.  Tabolich directed Speldrich to put Munoz on the phone.  *Id.* ¶ 41.  After speaking with Munoz, Tabolich informed Speldrich that Munoz was in the United States illegally.  *Id.* ¶ 42.  Tabolich next spoke with Mayolo Garcia and determined that Garcia was legally in the United States.  *Id.* ¶ 43.  A Spanish-speaking ICE agent — identified in the amended complaint as "John Doe #1" — then spoke with the remaining seven plaintiffs.  *Id.* ¶¶ 44-45.  Speldrich and Verkuilen told plaintiffs that they were not free to leave until the ICE agents had finished the interviews, and Speldrich and Verkuilen used their vehicle to block plaintiffs from driving away from the WMA parking lot.  *Id.* ¶¶ 59-60.

Based on the interviews, the ICE agents determined that five of the nine plaintiffs — the Group II plaintiffs — were in the United States illegally.  Tabolich directed Speldrich to take

---

[1]The amended complaint alleges that Munoz told the officers that he did not possess a Minnesota state identification card, but that a records search conducted by Speldrich disclosed that Munoz had been issued a Minnesota identification card, and thus had either lied or made a mistake.  *Id.* ¶¶ 38, 40.  In their briefing, Speldrich and Verkuilen do not identify this possible deception on Munoz's part as a reason for calling ICE.  Instead, Speldrich and Verkuilen say that they called ICE because Munoz "produced a non-resident hunting license and a Mexican identification document with a Minneapolis address."  ECF No. 33 at 2.

these Group II plaintiffs into custody.  *Id*. ¶ 56.  All nine of the plaintiffs were detained until

vehicles arrived to take the Group II plaintiffs to jail.  *Id*. ¶ 63.

The detention of the Group I plaintiffs ended when those vehicles arrived.  *Id*.  The

Group II plaintiffs were taken to the Mille Lacs County Jail and held there on the basis of

immigration detainers that Tabolich issued under 8 C.F.R. § 287.7.  A detainer issued under

§ 287.7 "serves to advise another law enforcement agency that the Department seeks custody of

an alien presently in the custody of that agency, for the purpose of arresting and removing the

alien."  8 C.F.R. § 287.7(a).  "Upon a determination by the Department to issue a detainer for an

alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of

the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order

to permit assumption of custody by the Department."  8 C.F.R. § 287.7(d).  The Group II

plaintiffs were detained at the Mille Lacs County Jail from Saturday, November 10, 2012 until

Tuesday, November 13, 2012, at which time they were transferred to the custody of ICE.

Am. Compl. ¶ 76.

Plaintiffs then filed this lawsuit.  In their amended complaint, plaintiffs bring the

following claims:[2]

- Each of the nine plaintiffs alleges that Speldrich, Verkuilen, Tabolich, and the John Doe ICE agent detained them without reasonable suspicion of illegal activity, in violation of the Fourth Amendment.

- Each of the nine plaintiffs alleges that Speldrich, Verkuilen, Tabolich, and the John Doe ICE agent used ethnicity as a motivating factor in deciding to question and detain them, in violation of the Equal Protection Clause.

---

[2]In their amended complaint, each of the nine plaintiffs asserted claims against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346(b).  Plaintiffs have since dismissed those claims.  *See* ECF No. 29.

- Each of the nine plaintiffs alleges that Speldrich and Verkuilen deprived them of equal access to public accommodations, in violation of the MHRA.

- The Group II plaintiffs allege that defendants Brent C. Lindgren (the Mille Lacs County Sheriff), Jeff Vee (a Mille Lacs County Deputy), Dan Mott (also a Mille Lacs County Deputy), and additional John Doe Mille Lacs County law-enforcement officers unlawfully detained them at the Mille Lacs County Jail, in violation of the Fourth Amendment.[3]

Defendants now move to dismiss all of plaintiffs' claims.

## II.  ANALYSIS

### A.  Standard of Review

In reviewing a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the Court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Aten*, 511 F.3d at 820.  Although the factual allegations in the complaint need not be detailed, they must be sufficient to "raise a right to relief above the speculative level . . . ."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The complaint must "state a claim to relief that is plausible on its face."  *Id*. at 570.  In assessing the sufficiency of the complaint, the court may disregard legal conclusions that are couched as factual allegations.  *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

---

[3]Plaintiffs also allege that, by illegally seizing them and discriminating against them on the basis of ethnicity, defendants violated their right to due process.  "[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (quotation omitted).  Each of plaintiffs' federal claims is governed by a specific constitutional provision, and thus the Court will examine those claims under the standards appropriate to those provisions.

## B. Defendants Speldrich and Verkuilen

Roughly speaking, plaintiffs bring three claims against Speldrich and Verkuilen.  First, plaintiffs allege that Speldrich and Verkuilen unlawfully seized them in violation of the Fourth Amendment when the officers (1) detained all plaintiffs for questioning without any reasonable suspicion of illegal activity and (2) further detained the Group II plaintiffs on the basis of the detainers issued under § 287.7.  Second, plaintiffs allege that they were targeted by Speldrich and Verkuilen on account of their Hispanic ethnicity in violation of the Equal Protection Clause.  Third, plaintiffs allege that Speldrich and Verkuilen denied them equal access and enjoyment of the WMA on account of their ethnicity.  The first two claims are brought under § 1983; the third claim is brought under the MHRA.

Speldrich and Verkuilen deny that they violated any right of any plaintiff.  They further argue that, even if they did violate someone's rights, they are entitled to qualified immunity, as they did not violate a clearly established statutory or constitutional right of which a reasonable law-enforcement officer would have known.  *See Williams v. Jackson*, 600 F.3d 1007, 1012 (8th Cir. 2010).

### 1.  Fourth Amendment

Plaintiffs argue that Speldrich and Verkuilen violated the Fourth Amendment at several points during the encounter on November 10, 2012.  The Court will proceed step-by-step through the encounter to determine whether, on the facts alleged by plaintiffs, Speldrich and Verkuilen committed one or more violations of the Fourth Amendment.

### a. Request for Hunting Licenses

Speldrich and Verkuilen began the November 10 encounter by asking eight of the nine plaintiffs to produce their hunting licenses.  Plaintiffs do not contend that this request was unlawful in any way.  *See* ECF No. 48 at 3 ("Such a request was entirely proper and legal as Plaintiffs were engaged in hunting and are required by law to produce a license upon request of a conservation officer.").

### b. Request for Photographic Identification

Minnesota law provides that conservation officers may verify that an individual who is carrying a hunting license is, in fact, the person identified on that license.  Pursuant to Minn. Stat. § 97A.405, subd. 2(b), "[u]pon request of a conservation officer or peace officer, a licensee shall write the licensee's name in the presence of the officer to determine the identity of the licensee." Section 97A.405 does not require hunters to produce a driver's license or other form of identification; to the contrary, § 97A.405 reflects an expectation that hunters will often not be carrying such documents in the field.  Consistent with this expectation, the statute allows for a hunter to verify his identity by signing his name in the presence of a conservation officer, so that the conservation officer can compare that signature to the signature on the hunting license.

Plaintiffs acknowledge that the procedure set forth in § 97A.405 is lawful — that is, they acknowledge that, under the Fourth Amendment, Speldrich and Verkuilen could have required plaintiffs to submit to the signature check described in § 97A.405.  Plaintiffs contend, however, that Minn. Stat. § 97A.405, subd. 2(b) provides the *only* method for verifying the identity of an individual who is carrying a hunting license.  According to plaintiffs, Speldrich and Verkuilen

violated both the Fourth Amendment and Minnesota law when they asked plaintiffs to produce driver's licenses or other forms of identification.

The Court disagrees.  To begin, § 97A.405 does not prohibit a conservation officer from asking someone who is carrying a hunting license to show a driver's license or other proof of identity.  There is no evidence — on the face of the statute or elsewhere — that, by authorizing the signature-check method for confirming identity, the Minnesota Legislature intended to bar conservation officers from asking for other types of identification.  Speldrich and Verkuilen did not violate § 97A.405 when they asked plaintiffs to produce driver's licenses or other forms of identification.

Of course, the fact that Speldrich and Verkuilen did not violate a Minnesota statute does not mean that they did not violate the Fourth Amendment.  But viewed through the lens of the Fourth Amendment, a request to see a driver's license is, if anything, less intrusive than a request to comply with the concededly constitutional signature-check method provided by § 97A.405.

First, those holding hunting licenses are *required* by § 97A.405 to comply with a demand for a signature.  By contrast, there is no suggestion in the amended complaint that Speldrich or Verkuilen required plaintiffs to show identification documents.  According to the amended complaint, the officers merely requested that plaintiffs do so, without threatening arrest or any other consequence if plaintiffs declined the request.  *See* Am. Compl. ¶ 29 ("Officers Speldrich and Verkuilen also requested that all Plaintiffs with a hunting license produce an identification document.").

Second, verifying a hunter's identity by asking him to produce a driver's license or other form of identification is likely to take less time than asking him to participate in a signature

check.  Whereas a driver's-license check can be completed almost instantaneously, a signature

check requires the conservation officer to provide paper and a pen or pencil to the hunter, the

hunter to sign his name, and the conservation officer to compare that signature to the signature

displayed on the hunting license.  Plaintiffs themselves concede that ordering a hunter to verify

his identity through a signature check is constitutional.  Clearly, then, the far less intrusive step of

asking a hunter to verify his identity by producing a driver's license or other form of

identification is also constitutional.

For these reasons, the Court finds that Speldrich and Verkuilen did not violate the Fourth

Amendment (or, for that matter, § 97A.405) when they asked each plaintiff to produce a driver's

license or other form of identification.  And because the Court holds that the Fourth Amendment

was not violated at all, the Court necessarily holds that Speldrich and Verkuilen are entitled to

qualified immunity because they did not violate any "'clearly established'" Fourth Amendment

rights when they asked plaintiffs to provide proof of identity.  *Williams*, 600 F.3d at 1012

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Accordingly, the motion to dismiss of

Speldrich and Verkuilen is granted insofar as the motion relates to the claim that they violated

the Fourth Amendment by asking plaintiffs to provide driver's licenses or other forms of

identification.

### c.  Detention During ICE Questioning

Each of the eight plaintiffs who was asked by Speldrich and Verkuilen to produce a

driver's license or other form of identification did so.  One of the plaintiffs, Angel Garcia

Munoz, produced a Mexican national identification document that listed a *Minneapolis* address.

But Munoz was using a *non*-resident hunting license.  This discrepancy caused Speldrich to

contact ICE to inquire about the immigration status of Munoz. Speldrich and Verkuilen told

plaintiffs that they were not free to leave "until they talked to ICE and 'until this problem was

fixed,'" and Speldrich and Verkuilen used their vehicle to block plaintiffs from driving away

from the WMA parking lot. *Id*. ¶¶ 59-60.

The facts alleged in the amended complaint would not support a finding that plaintiffs

were seized for purposes of the Fourth Amendment when Speldrich and Verkuilen checked their

identification documents. As a general matter, law-enforcement officers do not seize an

individual for purposes of the Fourth Amendment when they approach the individual in a public

place, ask questions of the individual, and ask the individual to produce identification, "'as long

as the police do not convey a message that compliance with their request is required.'" *United*

*States v. Vera*, 457 F.3d 831, 835 (8th Cir. 2006) (quoting *Florida v. Bostick*, 501 U.S. 429, 435

(1991)). As noted, plaintiffs do not allege that they were told either that they were legally

required to show identification or that they were forbidden from leaving until they did so.

By contrast, the facts alleged in the amended complaint would clearly support a finding

that plaintiffs were seized by Speldrich and Verkuilen during the course of the phone call to ICE.

"A person is seized within the meaning of the Fourth and Fourteenth Amendments when, taking

into account all of the circumstances surrounding the encounter, the police conduct would have

communicated to a reasonable person that he was not at liberty to ignore the police presence and

go about his business." *Livers v. Schenck*, 700 F.3d 340, 358 (8th Cir. 2012) (quotations

omitted). Plaintiffs allege that Speldrich and Verkuilen told them that they could not leave until

they spoke to Tabolich and the John Doe ICE agent about their immigration status. *See*

Am. Compl. ¶ 59. They further allege that their vehicles were blocked from leaving the parking

area of the WMA by the vehicle driven by Speldrich and Verkuilen.  *Id*. ¶ 60.  It is clear, then, that during the phone call with ICE, plaintiffs had been seized by Speldrich and Verkuilen for purposes of the Fourth Amendment.

The only rationale provided by Speldrich and Verkuilen for seizing the nine plaintiffs is that one of them — Munoz — presented both a non-resident hunting license and a Mexican identification document with a Minneapolis address.  According to Speldrich and Verkuilen, this discrepancy caused them to suspect that Munoz was in the United States illegally.  But this is a plainly insufficient basis for detaining the other eight plaintiffs.  Seven of those eight plaintiffs had presented valid hunting licenses and verified their identities by presenting driver's licenses or other forms of identification.  The eighth plaintiff, Jaime Sanchez Andablo, was not asked to show either a hunting license or a form of identification.  Each of these eight plaintiffs fully complied with the requests of Speldrich and Verkuilen, and neither officer contends that anything about those plaintiffs' responses caused the officers to suspect that the plaintiffs had committed a crime or immigration violation.

Moreover, the explanation offered by Speldrich and Verkuilen for the phone call to ICE — that Munoz had presented a non-resident hunting license and a Mexican national identification document with a Minneapolis address — does not even justify the detention of *Munoz*.  The possession of a foreign identification document listing a Minneapolis address is entirely consistent with possession of a non-resident hunting license.  Any number of explanations other than criminal conduct or immigration violations could explain why Munoz possessed that combination of documents.  Resident hunting licenses are not available to all individuals who temporarily live in Minnesota; some must seek non-resident hunting licenses.

*See* Minn. Stat. § 97A.015, subd. 33.  Munoz could have possessed a visa to work or attend

school in Minnesota, yet remained a resident of Mexico (not Minnesota).  Accordingly, Speldrich

and Verkuilen did not have a lawful basis for seizing any of the nine plaintiffs.

It was clearly established at the time that Speldrich and Verkuilen seized plaintiffs "that a

seizure without 'a truthful factual showing sufficient to constitute probable cause' violates the

Fourth Amendment."  *Livers*, 700 F.3d at 357 (quoting *Hedges v. Poletis*, 17 F.3d 1071, 1074

(8th Cir. 1999)).  If the allegations in the amended complaint are true, then Speldrich and

Verkuilen did not have "'a truthful factual showing sufficient to constitute probable cause,'" *id.*,

and therefore the officers violated clearly established law.[4]  Accordingly, the motion to dismiss of

Speldrich and Verkuilen is denied with respect to plaintiffs' claim that they were seized in

violation of the Fourth Amendment when they were not allowed to leave until ICE finished its

questioning.

> *d.  Detention Awaiting Transportation to the Mille Lacs County Jail*

After consulting with Tabolich and the John Doe ICE agent, Speldrich and Verkuilen

learned that the Group I plaintiffs were citizens or lawful permanent residents of the United

States and that the Group II plaintiffs were not.  All nine plaintiffs were detained by Speldrich

and Verkuilen until vehicles arrived to transport the Group II plaintiffs to the Mille Lacs County

---

[4]Speldrich and Verkuilen note that "Congress has done nothing to suggest it is inappropriate to communicate with ICE . . . .  Indeed, it has encouraged the sharing of information about possible immigration violations."  *Arizona v. United States*, 132 S. Ct. 2492, 2508 (2012).  But plaintiffs do not contest the authority of Speldrich and Verkuilen to *communicate with ICE*.  As far as plaintiffs are concerned, Speldrich and Verkuilen could have spent the rest of the day on the phone with ICE without violating anyone's constitutional rights.  What plaintiffs complain of is the fact that they were *seized* while Speldrich and Verkuilen were communicating with ICE.  It is the seizure, not the communication, that allegedly violated the Fourth Amendment.

Jail.  When the vehicles arrived, the Group I plaintiffs were allowed to leave, and the Group II plaintiffs were transferred to the custody of the Mille Lacs County Sheriff's Office.  Both groups of plaintiffs allege that this period of detention violated the Fourth Amendment.  The Court will separately consider each group's claims.

### i.  Group I Plaintiffs

The Court has already held that Speldrich and Verkuilen had no basis for detaining the Group I plaintiffs during the call to ICE.  In the course of that call, Speldrich and Verkuilen learned that each of the Group I plaintiffs was either a citizen or lawful permanent resident of the United States.  By that point in the encounter, then, Speldrich and Verkuilen had been told by ICE that the Group I plaintiffs had not committed any immigration violation.  Yet Speldrich and Verkuilen continued to detain the Group I plaintiffs until transportation arrived for the Group II plaintiffs.  *See* Am. Compl. ¶¶ 62-63.  If the allegations in the amended complaint are true, Speldrich and Verkuilen plainly violated the Fourth Amendment rights of the Group I plaintiffs by continuing to detain them, and neither officer is entitled to qualified immunity.

### ii.  Group II Plaintiffs

Following the phone call with ICE, the Group II plaintiffs were detained under 8 C.F.R. § 287.7 after ICE concluded that they were illegally present in the United States.  A detainer issued under § 287.7 is a "request" that a federal, state, or local law-enforcement agency holding an alien in custody "advise the Department [of Homeland Security], prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible."  8 C.F.R. § 287.7(a).

The Group II plaintiffs contend that their detention under § 287.7 was illegal because, they say, a request issued under § 287.7 does not provide a basis for detaining an individual unless the individual is already in the custody of a law-enforcement agency on suspicion of having committed a crime or after being convicted of a crime. The Group II plaintiffs were not charged with or convicted of committing a crime prior to the encounter with Speldrich and Verkuilen. The Group II plaintiffs therefore argue that their detention on the basis of the § 287.7 detainers was illegal.

Speldrich and Verkuilen are entitled to qualified immunity on this aspect of plaintiffs' Fourth Amendment claim. Whatever the merits of plaintiffs' underlying argument, it was far from "clearly established" as of November 2012 that Speldrich and Verkuilen did not have the authority to detain the Group II plaintiffs on the basis of the § 287.7 detainers.

First, despite the fact that § 287.7(a) appears to contemplate that detainees will already be in the custody of local law enforcement after being charged with or convicted of committing a crime, another section of § 287.7 suggests that local law enforcement may take an individual into custody solely on the basis of an immigration detainer. *See* 8 C.F.R. § 287.7(d) ("Upon a determination by the Department to issue a detainer for an alien *not otherwise detained by a criminal justice agency*, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department." (emphasis added)). Whether local law enforcement may constitutionally detain individuals based solely on suspicion of civil immigration violations is a matter of some doubt. *See Arizona v. United States*, 132 S. Ct. 2492, 2509 (2012) ("Detaining individuals solely to verify their immigration status would raise constitutional concerns."). But

Speldrich and Verkuilen are conservation officers, not constitutional scholars, and a reasonable conservation officer could have concluded in November 2012 that § 287.7(d) was a valid federal regulation and that § 287.7(d) authorized the detention of an individual when there was probable cause to believe that the individual had committed a civil immigration violation.

Second, the only judicial opinion that appears to have addressed the issue prior to November 2012 found "that the plain language of § 287.7 authorizes, and does not preclude, the issuance of immigration detainers for individuals who are not already in custody pursuant to an independent arrest." *Comm. for Immigrant Rights of Sonoma Cnty. v. Sonoma Cnty.*, No. C 08-4220 PJH, 2010 WL 841372, at *6 (N.D. Cal. Mar. 10, 2010), *vacated* 2011 WL 6936189 (N.D. Cal. Dec. 9, 2011). Although that order was later vacated on mootness grounds after ICE voluntarily adopted an internal policy not to issue detainers without an independent criminal basis for custody, this order was the only apposite case law in existence at the time of the November 2012 encounter. Thus, a reasonable officer in the position of Speldrich or Verkuilen could readily have concluded that detaining the Group II plaintiffs pursuant to the § 287.7 detainers was lawful.

The Group II plaintiffs cite a handful of recent judicial opinions in support of their argument that Speldrich and Verkuilen are not entitled to qualified immunity. *Cf. Galarza v. Szalczyk*, 745 F.3d 634 (3d Cir. 2014); *Santos v. Frederick Cnty. Bd. Of Comm'rs*, 725 F.3d 451 (4th Cir. 2013); *Morales v. Chadbourne*, C.A. No. 12-301-M, 2014 WL 554478 (D.R.I. Feb. 12, 2014); *Miranda-Olivares v. Clackamas Cnty.*, No. 3:12-CV-02317-ST, 2014 WL 1414305 (D. Or. Apr. 11, 2014). But these cases are unavailing. For one thing, each of these opinions was issued *after* November 10, 2012, and so a reasonable officer in the position of Speldrich or

Verkuilen could not have been aware of them.  For another, these cases are distinguishable.

*Galarza*, *Morales*, and *Miranda-Olivares* each involved instances in which no probable cause

existed to believe that the detained individuals had committed immigration violations.  *Galarza*,

745 F.3d at 638; *Morales*, 2014 WL 554478, at *5 ("One needs to look no further than the

detainer itself to determine that there was no probable cause to support its issuance.  The detainer

specifically stated that Ms. Morales should be held solely because an investigation of her status

in the United States had been initiated."); *Miranda-Olivares*, 2014 WL 1414305, at *11 ("[T]he

ICE detainer alone did not demonstrate probable cause to hold Miranda-Olivares.  It stated only

that an investigation 'has been initiated' to determine whether she was subject to removal from

the United States.").  In this case, however, the interrogation by ICE supplied probable cause to

believe that the Group II plaintiffs had committed such violations.

     The facts of *Santos* more closely resemble the facts of this case.  In *Santos*, local law-

enforcement officers detained the plaintiffs on the suspicion that they had committed civil

immigration violations.  About 45 minutes after the seizure was initiated, ICE issued detainers

for the plaintiffs to be transferred into the custody of ICE.  *Santos*, 725 F.3d at 466.  The *Santos*

court found that the law-enforcement officers were not entitled to qualified immunity for the

initial (unlawful) seizures, and it further found that "the ICE detainer [did] not cleanse the

unlawful seizure . . . ."  *Id.*  But *Santos* did not find that detention *pursuant to an ICE detainer* is

unlawful.  *Id.* at 465 ("[*A*]*bsent express direction or authorization by federal statute or federal

officials*, state and local law enforcement officers may not detain or arrest an individual solely

based on known or suspected civil violations of federal immigration law." (emphasis added)).

Like the law-enforcement officers in *Santos*, Speldrich and Verkuilen seized the Group II plaintiffs prior to the issuance of the ICE detainers. The Court has already held that, if the allegations of the amended complaint are true, Speldrich and Verkuilen violated the Fourth Amendment and are not entitled to qualified immunity for detaining the Group II plaintiffs during the phone call to ICE. And the Court certainly agrees that the fact that ICE later issued detainers "does not cleanse" those unlawful seizures. *Id*. at 466. But Speldrich and Verkuilen are nevertheless entitled to qualified immunity regarding the claim of the Group II plaintiffs that the officers violated the Fourth Amendment by continuing to detain them *pursuant to the § 287.7 detainers*. As the Court has already explained, a reasonable officer would not have known in November 2012 that seizing an individual pursuant to a § 287.7 detainer was unlawful. Accordingly, the motion to dismiss of Speldrich and Verkuilen is granted with respect to the claim of the Group II plaintiffs that the officers violated the Fourth Amendment by continuing to detain them following the phone call with ICE.

## 2. Equal Protection

Plaintiffs also allege that Speldrich and Verkuilen discriminated against them on the basis of their Hispanic ethnicity. According to the amended complaint, on the same day that Speldrich and Verkuilen asked plaintiffs to produce a form of identification, the officers did not ask similarly situated non-Hispanic hunters to verify their identities. *See* Am. Compl. ¶¶ 31-32. Plaintiffs further allege that Speldrich and Verkuilen made no inquiries to ICE about non-Hispanic hunters with facially valid hunting licenses. *Id*. ¶ 48 ("Officer Speldrich and Officer Verkuilen did not detain and require non-Hispanic persons engaged in hunting and with facially

-18-

valid hunting licenses, and encountered by the officers on November 10, 2012, to undergo

questioning as to whether they were 'legal in this country.'").

Plaintiffs have alleged sufficient facts to state a plausible claim that their rights under the

Equal Protection Clause were violated.  Contrary to the argument of Speldrich and Verkuilen,

plaintiffs have not simply alleged in conclusory fashion that they were discriminated against or

that they were treated differently on account of their Hispanic ethnicity.  Instead, plaintiffs have

specifically alleged that on the same day that Speldrich and Verkuilen asked them to verify their

identities and detained them for ICE questioning, Speldrich and Verkuilen did not act in the same

way toward similarly situated non-Hispanic hunters.  (Whether plaintiffs have an adequate basis

for making this allegation is an issue under Fed. R. Civ. P. 11, not under Fed. R. Civ. P. 12.)

Further, there can be no doubt that a reasonable officer would understand that it would have been

illegal to seize plaintiffs on the basis of their ethnicity.  *Cf. Goodwin v. Circuit Court of St. Louis*

*Cnty., Mo.*, 729 F.2d 541, 546 (8th Cir. 1984) ("No official can in good faith impose

discriminatory burdens on a person or group by reason of a racial or ethnic animus against them.

The constitutional right to be free from such invidious discrimination is so well established and

so essential to the preservation of our constitutional order that all public officials must be

charged with knowledge of it." (quotation omitted)).  Accordingly, the motion to dismiss of

Speldrich and Verkuilen is denied as to plaintiffs' equal-protection claim.

### 3.  MHRA

Speldrich and Verkuilen move to dismiss all claims against them, but their briefs do not

mention the MHRA claim pleaded in Count Six of the amended complaint.  Likewise, plaintiffs

do not say anything about the MHRA claim in their briefs.  Because the parties have treated the

MHRA claim as coterminous with the equal-protection claim, the Court will do likewise.  The Court therefore denies the motion of Speldrich and Verkuilen to dismiss the MHRA claim for the same reasons that it denied the officers' motion to dismiss the equal-protection claim.

### C.  Defendant Tabolich

Plaintiffs next argue that Tabolich[5] — the ICE agent who received the phone call from Speldrich and Verkuilen — illegally seized them in violation of the Fourth Amendment and discriminated against them on the basis of their Hispanic ethnicity in violation of the Equal Protection Clause.  Because the Court finds that Tabolich is entitled to qualified immunity on both of those claims, Tabolich's motion to dismiss is granted.[6]

### 1.  Fourth Amendment

Plaintiffs first allege that Tabolich seized them in violation of the Fourth Amendment. Tabolich's encounter with plaintiffs can be broken into two phases: (1) the phone call with all nine plaintiffs and (2) the issuance of § 287.7 detainers as to the Group II plaintiffs.

---

[5]These claims are also brought against the John Doe ICE agent who, along with Tabolich, interviewed plaintiffs on November 10, 2012.  This John Doe defendant has not been identified and is not represented in this litigation.  But because plaintiffs' claims and allegations against this officer are virtually identical to the claims and allegations against Tabolich, the Court dismisses the claims against the unnamed ICE agent for the same reasons that it dismisses the claims against Tabolich.

[6]Tabolich also argues that *Bivens* does not create a remedy for the specific violations alleged by plaintiffs.  Because the Court concludes that the claims against Tabolich should be dismissed on qualified-immunity grounds, the Court need not decide whether *Bivens* provides a remedy for the claims brought against Tabolich.

*a.  Phone Call*

According to plaintiffs, Tabolich illegally seized them during the duration of the phone call initiated by Speldrich and Verkuilen.  The Court has already determined that, if the facts alleged in the amended complaint are true, plaintiffs were seized for purposes of the Fourth Amendment during that phone call.  But plaintiffs were seized *by Speldrich and Verkuilen*, not by Tabolich.  It was Speldrich and Verkuilen who told plaintiffs that they could not leave and who blocked plaintiffs' vehicles from leaving the parking area of the WMA.  Tabolich was miles away, and thus he could not have physically constrained plaintiffs or otherwise displayed a show of authority sufficient to cause plaintiffs to believe that they were not free to go.  None of the facts alleged in the amended complaint would support a finding that Tabolich seized plaintiffs for purposes of the Fourth Amendment.[7]  *Cf. Sain v. Geske*, No. 07-CV-4203 (MJD/AJB), 2008 WL 2811166, at *21 (D. Minn. July 17, 2008) ("Burke's only contact with Sain was over the telephone, so he did not seize him under the Fourth Amendment.").

Plaintiffs attempt to overcome this hurdle by arguing that Tabolich used Speldrich and Verkuilen as his instrumentality to seize plaintiffs during the phone call.  But this argument also fails.  There is no allegation in the amended complaint that Tabolich directed Speldrich or Verkuilen to detain any of the plaintiffs during the phone call.  Tabolich did ask Speldrich and

---

[7]The closest plaintiffs come to alleging that the ICE agents compelled responses from them is a statement from the John Doe ICE agent to one of the plaintiffs that "'I know you are lying.  I am going to give you a second chance or it will go very bad for you.'" Am. Compl. ¶ 54.  But this is not a statement that plaintiffs were required to respond to questioning; it is a statement that, *if* plaintiffs responded to questioning, things would go "bad" for them if they *lied*.  Such a statement does not turn a telephone interview into a seizure.  *Cf. Rodgers v. Lincoln Towing Serv. Inc.*, 771 F.2d 194, 200 (7th Cir. 1985) ("That [the officer] may have been verbally abusive does not elevate the phone call . . . into a seizure for purposes of the Fourth Amendment.").

Verkuilen to put certain plaintiffs on the phone, but, as just explained, Tabolich did not tell the plaintiffs that they were legally required to answer any of the questions posed by ICE.  To the extent that plaintiffs felt compelled to answer such questions, it was on account of the actions of Speldrich and Verkuilen, not Tabolich.  There is no allegation that the actions of Speldrich and Verkuilen — such as telling plaintiffs that they were not free to leave or blocking plaintiffs' vehicles from leaving — were directed by Tabolich or that Tabolich was even *aware* of these actions.

Finally, plaintiffs suggest that knowledge of the illegality of the seizure conducted by Speldrich and Verkuilen should be imputed to Tabolich.  But it is highly doubtful that, under the Fourth Amendment, an ICE agent who receives a phone call from a law-enforcement officer with a request to interview a suspect must, before interviewing the suspect, independently (1) investigate whether the suspect has been seized and (2) investigate whether any such seizure is lawful under the Fourth Amendment.  Plaintiffs have not cited a single judicial opinion that has come close to holding that the Fourth Amendment imposes such an obligation on an ICE agent under the circumstances confronting Tabolich.  At a minimum, then, it was not clearly established in November 2012 that Tabolich was required to confirm that any seizure of plaintiffs by Speldrich and Verkuilen was lawful.

For these reasons, Tabolich is entitled to qualified immunity on plaintiffs' claim that he seized them in violation of the Fourth Amendment during the phone call.

*b. Section 287.7 Detainers*

The Group II plaintiffs next contend that Tabolich seized them in violation of the Fourth

Amendment when he issued detainers under § 287.7.  This claim fails for two reasons.

First, although the Group II plaintiffs were undoubtedly seized after Tabolich issued the

detainers, Tabolich did not do the seizing.  Rather, the seizing was done by Speldrich, Verkuilen,

and the Mille Lacs County officers.  Section 287.7 is clear that detainers are merely "request[s]"

to law-enforcement agencies to hold individuals.  8 C.F.R. § 287.7(a); *see also Galarza*, 745 F.3d

at 645 ("8 C.F.R. § 287.7 does not compel state or local [law-enforcement agencies] to detain

suspected aliens subject to removal pending release to immigration officials.  Section 287.7

merely authorizes the issuance of detainers as requests to local [law-enforcement agencies].").

The law-enforcement agencies receiving those requests are "free to disregard the ICE detainer

. . . ." *Id*.  The decision to hold the Group II plaintiffs in response to the detainers rested entirely

with Speldrich, Verkuilen, and the Mille Lacs County officers.  Thus it was those local law-

enforcement officers that seized the Group II plaintiffs, not Tabolich.

Second, even if Tabolich was deemed to have seized the Group II plaintiffs when he

issued the § 287.7 detainers, Tabolich is entitled to qualified immunity.  As discussed above, a

reasonable officer in Tabolich's position could have concluded that § 287.7(d) authorized him to

issue detainers after he learned that the Group II plaintiffs were in the United States illegally.  For

that reason, the Fourth Amendment claim of the Group II plaintiffs against Tabolich is dismissed.

2.  Equal Protection

Plaintiffs also allege that Tabolich violated the Equal Protection Clause by discriminating against them on the basis of ethnicity.  This claim, too, must be dismissed, as the amended complaint fails to plead facts that would allow a jury to find that Tabolich's actions were motivated by plaintiffs' ethnicity.

It was, of course, Speldrich and Verkuilen who placed the phone call to Tabolich to inquire about Munoz's immigration status; Tabolich did not initiate that investigation.  Tabolich was required by federal law to respond to the inquiry made by Speldrich and Verkuilen.  *See* 8 U.S.C. § 1373(c) ("The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.").  It is implausible that Tabolich was motivated by ethnic animus when he fulfilled his legal responsibility to respond to the inquiry from Speldrich and Verkuilen.

According to the amended complaint, Tabolich then asked Speldrich and Verkuilen to put the other eight plaintiffs on the phone to speak to him or to the John Doe ICE agent.  Unlike Munoz, these plaintiffs were not the subject of an investigation by local law enforcement; Tabolich initiated these inquiries on his own.  But it does not follow that Tabolich initiated these inquiries on account of plaintiffs' ethnicity; indeed, it is not clear whether Tabolich even *knew* the ethnicity of the other hunters when he asked to speak with them.  At the time that he asked to speak to the other plaintiffs, Tabolich knew that a group of men had been hunting together, and he knew that one of those men was in the United States unlawfully.  None of the facts alleged in

-24-

the complaint would allow a jury to find that, under these circumstances, Tabolich asked to speak to the other members of the hunting party because they were Hispanic instead of because they were in the company of someone who was breaking the immigration laws.  As a result, plaintiffs have not pleaded a plausible equal-protection claim against Tabolich.  *Iqbal*, 556 U.S. at 680-84.  Accordingly, Tabolich's motion to dismiss the equal-protection claim is granted.

### D.  Defendants Lindgren, Vee, and Mott

After being seized by Speldrich and Verkuilen and being questioned by Tabolich and the John Doe ICE agent, the Group II plaintiffs were transferred to the custody of the Mille Lacs County Sheriff's Office.  The Group II plaintiffs allege that the Mille Lacs County Sheriff and his deputies acted unlawfully in detaining them because the only basis for that detention was the § 287.7 detainers issued by ICE.  As the Court has already held, however, a reasonable law-enforcement officer could have concluded in November 2012 that the detainers issued by ICE provided a legal basis to detain the Group II plaintiffs.  Lindgren, Vee, and Mott are therefore entitled to qualified immunity on the Fourth Amendment claim against them.  Accordingly, the motion to dismiss of Lindgren, Vee, and Mott is granted.

### ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.      The motion to dismiss of defendants Brent Speldrich and Greg Verkuilen [ECF No. 31] is GRANTED IN PART AND DENIED IN PART, as explained more fully in the body of this order.

2.      The motion to dismiss of defendant Jesse J. Tabolich [ECF No. 19] is

GRANTED.  The amended complaint is DISMISSED WITH PREJUDICE AND

ON THE MERITS as to Tabolich and the John Doe ICE agent.

3.      The motion to dismiss of defendants Brent C. Lindgren, Dan Mott, and Jeff Vee

[ECF No. 35] is GRANTED.  The amended complaint is DISMISSED WITH

PREJUDICE AND ON THE MERITS as to Lindgren, Mott, Vee, and the Mille

Lacs County John Doe defendants.

Dated:  August  6 , 2014                               s/Patrick J. Schiltz
                                                       Patrick J. Schiltz
                                                       United States District Judge